Sealed
Public and unofficial staff access
to this instrument are
prohibited by court order.

## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS, HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | CIVIL ACTION NO. _____ |
| *EX RELS.* LISA PARKER AND | § | |
| MARIBETH HOLDERITH | § | |
| | § | FILED *IN CAMERA AND UNDER* |
| | § | **SEAL** |
| VS. | § | |
| | § | **FALSE CLAIMS ACT**    United States Courts |
| MOHAMMAD ATHARI, M.D. | § | Southern District of Texas |
| MOHAMMAD ATHARI, M.D, P.A. | § | F I L E D |
| BAYTOWN OPEN MRI, LLC | § | JUN 1 1 2020 |
| HUMBLE OPEN MRI, LLC | § | |
| UNIVERSAL MRI & DIAGNOSTICS | § | David J. Bradley, Clerk of Court |
| UNITED NEUROLOGY | § | |
| | § | **MEDICAID AND MEDICARE FRAUD** |
| | § | |
| DEFENDANTS | § | **JURY TRIAL DEMANDED** |

## PLAINTIFFS' COMPLAINT PURSUANT TO 31 U.S.C. §§3729-3732 OF THE FEDERAL FALSE CLAIMS ACT

The United States of America by and through *qui tam* relators Lisa Parker and Maribeth Holderith, bring this action under 31 U.S.C. 3729, *et seq.*, as amended (False Claims Act) to recover all damages, penalties, and other remedies established by the False Claims Act on behalf of the United States.

## I.  PRELIMINARY STATEMENT

1.  This is an action to recover damages and civil penalties on behalf of the United States of America, for violations of the False Claims Act arising from false or fraudulent records, statements, or claims, or any combination thereof, made, used, or caused to be made, used, or presented, or any combination thereof, by the Defendants, their agents, employees, or co-conspirators, or any combination thereof, with respect to false claims that were submitted to the federal Medicare and Medicaid programs.

2.  This action is also brought on behalf of the State of Texas (pursuant to the Texas Medicaid Fraud Prevention Law, (TEX. HUM. RES. CODE, Sections 36.001 – 32.132).

3.  The False Claims Act was enacted during the Civil War. Congress amended the False Claims Act in 1986 to enhance the Government's ability to recover losses sustained as a result of fraud against the United States after finding that fraud in federal programs was pervasive and that the False Claims Act, which Congress characterized as the primary tool for combating government fraud, was in need of modernization. Congress intended that the amendments create incentives for individuals with knowledge of fraud against the government to disclose the information without fear of reprisals or Government inaction, and to encourage the private bar to commit legal resources to prosecuting fraud on behalf of the Government.

4.  The False Claims Act provides that any person who knowingly submits, or causes the submission of, a false or fraudulent claim to the U.S. Government for payment or approval is liable for a civil penalty up to $10,461 (2019 amount adjusted for inflation) for each such claim, plus three times the amount of the damages sustained by the Government.

5.  The Act allows any person having information about a false or fraudulent claim against the Government to bring an action for himself and the Government, and to share in any recovery. The Act requires that the complaint be filed under seal for a minimum of 60 days (without service on the Defendants during that time) to allow the Government time to conduct its own investigation and to determine whether to join the suit. The False Claims Act also prohibits making, using, or causing to be made or used a false record or statement material to a false or fraudulent claim. In 2016, the penalty

for violating this prohibition was $50,000 per violation. The 2019 adjustment increases this penalty to $52,308.

6. Under Medicare and Medicaid, medical providers have specific responsibilities to prevent false claims from being presented and are liable under the False Claims Act for their role in the submission of false claims.

7. This is an action for treble damages and penalties for each false claim and each false statement under the False Claims Act, 31 U.S. 3729, *et seq.*, as amended.

8. Implied false certification theory can be a basis for liability. Specifically, liability can attach when the defendant submits a claim for payment that makes specific representations about the goods or services provided, but knowingly fails to disclose the defendant's noncompliance with a statutory, regulatory, or contractual requirement. In these circumstances, liability may attach if the omission renders those representations misleading. The Supreme Court has held that failing to disclose violations of legal requirements does not turn upon whether those requirements were expressly designated as conditions of payment. Defendants can be liable for violating requirements even if they were not expressly designated as conditions of payment. What matters is not the label the Government attaches to a requirement, but whether the defendant knowingly violated a requirement that the defendant knows is material to the Government's payment decision. A misrepresentation about compliance with a statutory, regulatory, or contractual requirement must be material to the Government's payment decision in order to be actionable under the False Claims Act. This prevents practitioners such as Defendants from presenting claims for payment performed by unlicensed and uncertified practitioners and demanding payment from the Government.

3

Further, a practitioner who bills the Medicare and Medicaid systems for payment files bills certifying the practitioner earned the payment requested and complied with the billing requirements. Defendants, since at least 2009, have been billing the Medicare and Medicaid system utilizing unlicensed practitioners yet passing the records off as Defendant Athari's services. Thus, Defendants are billing for services not rendered by a proper licensed physician.

9. This Complaint describes two false and fraudulent practices that have been occurring since at least 2009.  Defendant Athari, since at least 2009, operated multiple imaging centers in the Harris County, Texas area, yet did not office in those facilities until May 2019. Almost every patient referred to him was self-referred in violation of the prohibition on self-referral to his imaging center for diagnostic procedures (including MRI's and CT imaging). Defendant Athari also performed unnecessary EEGs, EMGs, and or carotid Doppler ultrasounds that were performed in a facility owned by Defendant Athari. Defendant Athari would then falsely author the treatment record as if the referring physician requested the imaging study (his front desk clerk, Brenda Harrison does this falsification), yet placing Defendant Athari's phone and fax numbers on the patients' medical record. Second, Defendants utilized unlicensed personnel (some of whom were foreign immigrants) to perform EEG, EMG, and carotid Doppler testing and then read them and interpret the results without the physician supervising or reading the reports. These immigrants were utilized to lower Defendants' operating payroll. Dr. Athari's name would then be falsely placed on the final reports as if he himself had interpreted the study, when in actuality, all he did was to order the tests and read the report prepared and reviewed by the unlicensed and nontrained individuals (s).

4

10. As required by FCA, 31 U.S.C. § 3730(b)(2), Relators have provided to the Attorney General of the United States and to the United States Attorney for the Southern District of Texas, simultaneous with and/or prior to the filing of this Complaint, a statement of all material evidence known to Relators at their time of filing, establishing the existence of the Defendants' legal responsibility for the false claims. Because the statement includes attorney-client communications and work product of Relators' attorneys, and is submitted to the Attorney General and to the United States Attorney in their capacity as potential co-counsel in the litigation, the Relators understand this disclosure to be confidential.

11. Relators are informed and believe that the false claims described herein, including violations of Stark Law and Anti-Kickback Law, began no later than 2009 and continue to date.

12. Relators bring this action based on their direct knowledge and also on information and belief; none of the actionable allegations set forth in this Complaint are based on a public disclosure as set forth in 31 U.S.C. § 3730(e)(4). Notwithstanding same, Relators are original sources of the facts alleged in this Amended Complaint.

13. As may be required by the Texas Medicaid Fraud Prevention Act, Relators have provided to the appropriate state officials of Texas, simultaneous with and/or prior to the filing of this Complaint, a statement of all material evidence known to Relators at their time of filing, establishing the existence of the Defendants' legal responsibility for the false claims. Because the statement includes attorney-client communications and work product of Relators' attorneys, and is submitted to the Attorney General and to the

5

United States Attorney in their capacity as potential co-counsel in the litigation, the Relators understand this disclosure to be confidential.

## II. PARTIES

14. Relator Lisa Parker is currently employed in the job capacity of radiologic technologist employed by Defendant Athari and working in that capacity since 2006 at Baytown Universal MRI and Humble MRI and Diagnostics outlined below in this subchapter.  Relator Maribeth Holderith is a healthcare marketer who markets hospital services in the Harris County, Texas area and whom has been regularly employed by Defendant Athari since at least 2006. Relators Parker and Holderith witnessed and acquired firsthand knowledge of Defendants' schemes, most importantly the use of unlicensed practitioners to perform and interpret imaging studies. Relators have both personally viewed and had access to medical records of numerous patients who were self-referred by Defendant Athari to his imaging facilities. Relators further have knowledge of Defendants' use of uncertified and unlicensed personnel to perform tests and then submit those tests to the Government illegally for payment.

15. Defendant Mohammad Athari, M.D. (hereinafter Dr. Athari) is an individual residing in Houston, Texas at 200 Carnarvon Drive, Houston, Texas 77024, in the District where the false claims arising under the False Claims Act were made. Dr. Athari is the sole owner and officer (taking titles of President, Vice-President, Secretary, Treasurer, Member or Director) of all of the Defendant companies. Dr. Athari has an active professional association (Mohammad Athari, M.D., P.A.) but operates United Neurology as his clinical practice. Dr. Athari formerly owned and operated a multitude of imaging businesses, but still actively lists Normandy Open MRI, Quantum MRI &

6

Diagnostic, and Universal MRI and Diagnostic, but it is unknown if these specific businesses are part of the current scheme. Beginning in at least 2009, and likely prior, Dr. Athari began self-referring patients referred to him by other physicians to his own imaging facilities. Dr. Athari then had unlicensed personnel performing and interpreting thousands of imaging studies without notification to the Government such practitioners were presiding over the tests, materially affecting the Government's decision to pay these fraudulent claims.

15. Defendants Mohammad Athari, M.D., P.A., and United Neurology are professional associations or some other business entity operating in the State of Texas. They are both owned by Dr. Athari and are the clinical practices he utilizes to self-refer his patients to his imaging facilities. These Defendants are part of the vehicles by which these false claims enumerated in this Complaint were submitted to the Government under the False Claims Act. Both Defendants are located at 2321 Southwest Freeway, Houston, Texas 77098.

16. Defendants Baytown Open MRI, LLC and Humble Open MRI, LLC are limited liability corporations or some other business entity operating in the State of Texas. They are owned by Dr. Athari, and he is the sole officer listed for both companies. These facilities are the imaging centers whereby Dr. Athari self-referred his patients to undergo imaging studies by unlicensed practitioners. They are the primary vehicles by which these false claims enumerated in this Complaint, were submitted to the Government under the False Claims Act. Both centers share the same location at 2215 Southwest Freeway, Houston, Texas 77098.

7

## III. JURISDICTION AND VENUE

17. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. 1331, and 31 U.S.C. 3732, the latter of which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. 3729 and 3730.

18. There have been no public disclosures of the allegations or transactions contained herein that bar jurisdiction under 31 U.S.C. 3730(e).

19. This Court has personal jurisdiction over the Defendants pursuant to 31 U.S.C. 3732(a) because that section authorizes nationwide service of process and because all Defendants have at least minimum contacts with the United States, and can be found in, reside, or transact or have transacted, business in Houston, Harris County, Texas in the Southern District of Texas.

20. Venue exists in the United States District Court in the Southern District of Texas, Houston Division, pursuant to 31 U.S.C. 3730(b)(1) because all of the Defendants have at least minimum contacts with the United States, and all the Defendants can be found in, reside, or transacted business in Houston, Texas in the Southern District of Texas.

## IV. APPLICABLE LAW

21. Medicaid is a public assistance program providing for payment of medical expenses for low-income patients. Funding for Medicaid is shared between the federal government and state governments.

22. Every Medicaid provider must agree to comply with all Medicaid requirements.

23. False Claims Act liability attaches to any person who knowingly presents or causes a false or fraudulent claim to be presented for payment, or to a false record or statement to get a false or fraudulent claim paid by the Government. 31 U.S.C. 37299(a)(1)&2.

24. Under the False Claims Act, "knowing" and "knowingly" mean that a person, with respect to information:

(1) has actual knowledge of the information;

(2) acts in deliberate ignorance of the truth or falsity of the information; or

(3) acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent to defraud is required. 31 U.S.C. 3729(b)

25. The False Claims Act is violated not only by a person who makes a false statement or a false record to get the Government to pay a claim, but also by one who engages in a course of conduct that causes the Government to pay a false or fraudulent claim for money.

26. In 1965, Congress enacted Title XVIII of the Social Security Act, known as the Medicare Program, to pay for the costs of certain healthcare services. Entitlement to Medicare is based on age, disability, or affliction with certain diseases. See 42 U.S.C. §§ 1395 to 1395ccc. There are two general components to the Medicare program: Part A and Part B.

27. The False Claims Act is the government's primary tool to recover losses due to fraud and abuse by those seeking payment from the United States. *See* S. Rep. No. 345, Cong., 2nd Sess. at 2 (1986).

28. The Stark Law. 42 U.S.C. §1395nn, is also known as the Physician Self-Referral Law. The regulations are at 42 C.F.R. § 411.350 *et seq.* Under the Stark Law, if a physician (or immediate family member) has a direct or indirect financial relationship (by way of ownership or compensation) with an entity that provides any of the health services identified in the statute ("designated health services" or "DHS") the physician cannot refer patients to the entity for DHS and the entity cannot submit a claim to Medicare or Medicaid for such DHS unless the financial relationship comes under a statutory or regulatory exception.

29. Liability under the Stark Law involves three elements: (1) a physician refers a patient to an entity for a designated health service; (2) the physician and the entity have a financial relationship, and (3) none of the Stark exceptions apply.

30. The case law is well established, including that of the Fifth Circuit, that the submission of claims in violation of the Stark Law can give rise to False Claims liability. Every UB-92, CMS-1450, CMS-1500, and other claim forms submitted to Government Healthcare Programs by Defendants for services rendered to patients who were unlawfully referred in violation of the Stark Law and/or Anti-Kickback Law were also false.

## V. ALLEGATIONS

### A. Improper and Ineligible Referral of Clinic Patients

31. Defendants' scheme is illustrated by and through the specific patient charts disclosed by Relators in their Disclosure Statement as well as with their personal knowledge. These schemes were personally witnessed by Relators. For example, patient C.C., a Medicaid patient, was referred by Dr. Athari's clinic practice United

Neurology to his imaging facility, Universal Baytown MRI. Dr. Athari then ordered a brain MRI and cervical spine MRI to be performed at Universal Baytown MRI, listing a physician other than himself as the "referring physician." Dr. Athari, however, would document United Neurology's phone and fax number as the contact information for the claim, noting the studies were to be "cc'd" to United Neurology, not to the referring physician. Also, when requesting specific approval through Medicaid's contractor who authorized approval for the procedure, Dr. Athari listed himself as the referring physician, providing direct proof he was self-referring the patient as opposed to the identified "referring physician" on the record.

32. This scheme additionally applied to patients with Part B or C Medicare coverage. Patient B.B. was insured through Part C Medicare Advantage and instructed by Dr. Athari to undergo a shoulder MRI. A physician other than himself was listed as the "referring physician" on B.B.'s record. However, when submitting approval for authorization to perform the procedure, Defendants provided Dr. Athari's name as the treating provider, illustrating that he was self-referring the patient to his own facility.

33. Relators Holderith and Parker have personally reviewed numerous medical charts of Dr. Athari's patients with Part B and Part C Medicare or Medicaid coverage who were treated in the same or similar fashion. Relators' belief is that Dr. Athari utilized other referring physicians' names to avoid concerns for any potential Medicare or Medicaid audit, as placing a different physician's name on the record would not raise suspicions. However, when seeking approval for the imaging services, Dr. Athari utilized his name when seeking approval for the imaging procedures. This kept the referring physicians whose names were falsely documented as "referring" providers from

11

discovering their identities were being used to obtain procedures they did not authorize. According to Relators, this method allowed Dr. Ahtari's self-referrals to go unnoticed by either Medicaid, Medicare, the Part C insurers, or the "referring" physicians, while further allowing Defendants to bill the Government for millions of dollars for illegally self-referred patients who were unaware of Dr. Ahtari's financial interest in the facility. Relators have obtained ledgers and logs from Defendants which include numerous Medicaid and Medicare patients whom Dr. Athari self-referred to his own imaging centers. While the names of multiple physicians appear on the logs as the "referring physicians," Dr. Athari's clinical office and fax number are listed for those providers.

### B. Use of Unlicensed Personnel/Unnecessary Imaging Studies

34. Relators have personally witnessed unqualified and unlicensed personnel performing EEG, Doppler, and EMG imaging studies upon patients referred to the Defendants' clinical practice by Dr. Athari. Relator Parker has been present when an employee of Defendants, Sam Fotovvat, has interpreted EEG's, EMG's, and MRI's. Mr. Fotovvat is natural-born Iranian citizen with no medical degree in the United States. Relator Parker has specifically reviewed diagnostic reports interpreted by Mr. Fotovvat that are then transcribed for Dr. Athari's review. Once the reports are transcribed, Dr. Athari then read the transcribed results to the patients as if he interpreted the results. However, Dr. Athari himself never actually interpreted anything. He only reads the results of the report prepared by the unqualified and unlicensed Fotovvat.

35. Relator Holderith also noticed this practice and discussed it with the office manager for Dr. Ahtari's clinic. Relator Holderith preserved a recording of this encounter. During the conversation, Dr. Athari's office manager confirmed to Relator

Holderith that Mr. Fotovvat reads EEG's that are performed by other immigrant personnel. The office manager also informed Relator Holderith that Mr. Fotovvat performed all EMG's and interpreted those EMG's for Dr. Athari. The only thing Dr. Athari would do would be to read the results Mr. Fotovvat interpreted on the EMG's to the patients. The two immigrant personnel, referred to as Golshan and Amin, perform EEG's and some MRI's on the patients, although they have no qualifications or formal education for either. These two unlicensed persons are also Iranian nationals whom have immigrated to the United States, one of which is an engineer and the other was an attorney in their native country of Iran.

36. Relator Parker began to have concerns when a patient, R.G., underwent a carotid Doppler ultrasound in Defendants' imaging facility by an unqualified practitioner. The report was interpreted by Mr. Fotovvat as normal and not read by Dr. Athari. The patient ended up having a massive stroke, and it was discovered in the hospital that the patient was suffering from bilateral occlusions in the carotid arteries, contradicting the diagnostic performed by the unlicensed employee and misread by Mr. Fotovvat.

37. After this occurred, Relator Parker began to experience multiple other concerns about the licensure of personnel and the necessity of procedures performed or ordered by Dr. Athari. She was asked to train some of the unlicensed persons to perform MRI's, and soon after, Relator Parker's work hours were reduced. Relator Parker came into knowledge that the unlicensed technicians were being paid a lower wage, and Relator Parker believes Dr. Athari did so to increase his revenue and profit margin, while reducing and cutting the hours of qualified technicians like herself.

38. Further, Relators Parker and Holderith both noticed the large volume of patients whom were undergoing EMG's, EEG's, Dopplers, and MRI's. Because of the size of the self-referrals, and the limited time to do them, Relator Parker came to understand that the unlicensed, uneducated, and unqualified personnel performing the exams were instructed to skip critical stages of the test in order to accommodate these large numbers of patients. Relator Parker was of the belief the suboptimal personnel and the instruction to skip these portions of the tests resulted in patients' results being inaccurate, as was with patient R.G. Relator Parker came to realize that some of these patients' results would later turn out to be inaccurate when read and interpreted by a proper practitioner.

39. Relators Holderith and Parker also discovered that in order to continue to receive pain medication, Dr. Athari required his clinical patients to repeat diagnostic scans at 6-month intervals or more, which would include EMG's, EEG's, and MRI's although some (or many) of the patients had no indications for any such tests. They were instead mandatory in order to receive narcotic prescriptions, were again performed by the unlicensed immigrant employees (or Mr. Fotovvat), interpreted by Mr. Fotovvat, and then Mr. Fotovvat's results were then read to the patients by Dr. Athari. Relator Parker learned that some of the patients were being prescribed Norco who did not even utilize their precscription. Others were abusing their pain medication.  Dr. Athari was simply documenting the patient was on pain medication to justify the need for repeat diagnostics. Dr. Athari continued to prescribed narcotic pain medications and repeat diagnostics at these intervals regardless of the necessity of the medications.

40. Relator Parker specifically witnessed patients commenting that the EMG needle was not painful in Defendants' clinic as opposed to previous EMG's on another hospital setting. The reason for this was that Relator Parker was aware that to cut corners (and time), the EMG needle was not changed for every patient. Thus, the EMG needle was likely not effective, compromising the integrity of the test. Dr. Athari, however, refused to make any changes in the way the EMG needles were utilized and continues to operate the same as of the date of this filing.

41. Relator Parker discovered that not only did Dr. Athari fail to interpret the EEG's, EMG's, and the Dopplers himself, he was incapable of doing so because the machine performing the tests do not record the operations of each exam. Thus, the only person who witnessed the tests to interpret them was Mr. Fotovvat. Dr. Athari never verified the accuracy or sufficiency of these exams, and that is not only substantiated by Relators Parker and Holderith personally witnessing Mr. Fortovvat doing so, but also because Mr. Fotovvat's handwriting appears all over the patients' records while Dr. Athari's does not.

42. Relators believe Dr. Athari intentionally failed to supervise these tests in order to allow lower-paid, unqualified personnel to perform them. While Dr. Athari placed his signature on the transcribed reports prepared by Mr. Fotovvat as if he personally interpreted the results, he did not.

## VI. CAUSES OF ACTION

### Count 1: False Claims Act

43. Relators repeat and re-allege each allegation contained in Paragraphs 1 through 61, above, as if fully set forth herein.

44. This is a claim by Relators, on behalf of the United States of America, for treble damages and penalties under the FCA, 31 U.S.C. §§ 3729, *et seq*. against Defendants for knowingly causing to be presented false claims to Government Healthcare Programs. From at least 2009 to the present, in the Southern District of Texas, Defendants have knowingly and willfully presented and caused to be presented false claims.

45. Defendants have presented and caused to be presented claims for payment to the Government Healthcare Programs, knowing such claims were false.

**Count 2: Texas False Claims Act**

46. Relators repeat and re-allege each allegation contained in Paragraphs 1 through 49, above, as if fully set forth herein.

47. Medicaid is jointly financed by the federal government and the states. The Secretary of the U.S. Department of Health and Human Services determines each state's federal share of most healthcare costs using a formula based on average state per capita income compared to the U.S. average. These matching rates are updated every year to reflect changes in average income.

48. The matching rate of the State of Texas over the past ten years has been approximately sixty (60) percent; that is, the state must pay approximately (40) percent of most Medicaid costs.

49. The Texas Health and Human Services Commission administers the Texas Medicaid Program.

50. This *qui tam* action is brought by Relators on behalf of the State of Texas to recover double damages and civil penalties under V.T.C.A. HUM. RES. CODE §§ 36.001, *et seq.*

51. V.T.C.A. HUM. RES. CODE §§ 36.001 provides liability for any person who:

(1) knowingly makes or causes to be made a false statement or misrepresentation of a material fact to permit a person to receive a benefit or payment under the Medicaid program that is not authorized or that is greater than the benefit or payment that is authorized;

(2) knowingly conceals or fails to disclose information that permits a person to receive a benefit or payment under the Medicaid program that is not authorized or that is greater than the benefit or payment that is authorized;

(4) knowingly makes, causes to be made, induces, or seeks to induce the making of a false statement or misrepresentation of material fact concerning:

(B) information required to be provided by a federal or state law, rule, regulation, or provider agreement pertaining to the Medicaid program;

(5) except as authorized under the Medicaid program, knowingly pays, charges, solicits, accepts, or receives, in addition to the amount paid under the Medicaid program, a gift, money, a donation, or other consideration as a condition to the provision of a service or product or the continued provision of a service or product if the cost of the service or product is paid for, in whole or in part, under the Medicaid program;

(9) knowingly enters into an agreement, combination, or conspiracy to defraud the state by obtaining or aiding another person in obtaining an unauthorized payment or benefit from the Medicaid program or a fiscal agent; and

(13) knowingly engages in conduct that constitutes a violation under 32.039(b).

51. Defendants violated V.T.C.A. HUM. RES. CODE §§ 36.002 and knowingly caused thousands of false claims to be made, used, and presented to the State of

Texas by their deliberate and systematic violations of federal and state laws, including the federal Anti-kickback Act, the Stark Law, and § 36.002.

52. The State of Texas, by and through the Texas Medicaid Program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

53. Compliance with applicable Medicare, Medicaid, and various other federal and state laws cited herein was an implied and express condition of payment of claims submitted to the State of Texas in connection with Defendants' conduct. Compliance with applicable Texas statutes and regulations was also an express condition of payment of claims submitted to the State of Texas.

54. Had the State of Texas known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct were premised on the false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

55. As a result of Defendants' violations of V.T.C.A. HUM. RES. CODE § 36.002, the State of Texas has been damaged in an amount in excess of millions of dollars exclusive of interest.

56. Defendants did not, within thirty (30) days after they first obtained information as to such violations, furnish such information to officials of the State responsible for investigating false claims violations, did not fully cooperate with any investigation of the violations, and have not otherwise furnished information to the State regarding the claims for reimbursement at issue.

57. Relators are citizens of Texas with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to V.T.C.A. HUM. RES. CODE §§ 36.101 on behalf of themselves and the State of Texas.

58. This Court is requested to accept pendent jurisdiction of this related state claim as it is predicated upon the identical facts as the federal claim, and merely asserts separate damage to the State of Texas in the operation of its Medicaid program.

59. Pursuant to *Universal Health Services, Inc. v. United States, ex. rel. Escobar*, 579 U.S. 1989 (2016), Defendants utilized unlicensed and unqualified personnel without informing the United States in order to receive federal funds, which amounts to knowing misrepresentations of compliance with statutory, regulatory, and contractual terms material to the payment of funds by the United States.

## VII. DEFENDANTS' LIABILITY

60. By virtue of the acts described above, Defendants knowingly (a) submitted, and continue to submit, and/or (b) caused and/or continue to cause to be submitted, false or fraudulent claims to the United Stated Government for payment of services prescribed to Medicaid enrollees that were either excessively charged, deceptively charged, and/or unnecessarily charged.

61. The Government paid and continues to pay such false claims.

62. By reason of the Defendants' acts, the United States has been damaged, and continues to be damaged, in substantial amounts to be determined at trial.

## VIII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff, United States of America, through Relators, requests the Court enter the following relief:

A. That Defendants be ordered to cease and desist from violating 31 U.S.C. 3729, *et seq.;*

B. That the Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States has sustained because of Defendants' actions, plus a civil penalty of not less than Five Thousand Five Hundred Dollars ($5,500) and not more than Eleven Thousand Dollars ($11,000) for each violation of 31 U.S.C. 3729;

C. That Relators be awarded the maximum amount allowed pursuant to Section 3730(d) of the False Claims Act;

D. That the Court enter judgment against the Defendants up to two times the amount of actual damages which the State of Texas has sustained as a result of Defendants' conduct;

E. A civil penalty of not less than Five Thousand Dollars ($5,000) or more than Ten Thousand Dollars ($10,000) pursuant to V.T.C.A. HUM. RES. CODE §§ 36.052(a)(3)(b) for each false claim which Defendants cause to be presented to the State of Texas;

F. Prejudgment interest;

G. That Relators be awarded all costs of this action, including attorney's fees and expenses; and

H. That Relators recover such other relief as the Court deems just and proper.

DATED this, the 11th day of June, 2020.

Respectfully Submitted,

Collin Cobb
ATTORNEY AT LAW
State Bar No. 24038058
1323 Port Neches Avenue, Ste. 206
Port Neches, TX 77651
(409) 853-4085

(409) 292-5065 - Fax

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of this Complaint and written disclosure of substantially all material evidence and information Relator possesses has been served on the Government in sealed envelopes marked "SEALED CASE" at the addresses set forth below pursuant to FRCP 4:

Attorney General of the United States
919 Pennsylvania Avenue, N.W.
Washington, D.C. 20530-0001

United States Attorney for the Southern District of Texas
919 Milam Street, Ste. 1500
Houston, Texas 77002

Dated:   June 11, 2020.

COLLIN D. COBB